Filed 6/2/25  P. v. Barnes CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

ROMAN EARL BARNES,

    Defendant and Appellant.

E082745

(Super.Ct.No. FVA010870)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Kyle S. Brodie, Judge.  Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Seth M. Friedman, Andrew Mestman, and James M. Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.

# INTRODUCTION

Defendant and appellant Roman Earl Barnes appeals the trial court's order denying his Penal Code[1] section 1172.6 (formerly section 1170.95) petition to recall his first degree murder (§ 187, subd. (a)) conviction and for resentencing following an evidentiary hearing.  In connection with the petition, defendant argued his statements to law enforcement should be excluded under current law.  The court admitted defendant's statements and found defendant was the actual killer in the underlying offenses.  Accordingly, the court denied the petition.  On appeal, defendant contends the trial court erred in denying his petition because the court erred in finding defendant did not invoke his right to counsel in violation of his Sixth Amendment right.  We affirm the order.

---

[1] Unless otherwise specified, all future statutory references are to the Penal Code.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Factual Background*

On January 5, 1999, Mrs. Dresser was 85 years old.  She lived alone in a house in Rialto, her home since 1944.  In December, the month before, her house had been burglarized so she had installed a burglar alarm and bought a small watch dog.

On the evening of January 5, the fire department responded to an alarm at Mrs. Dresser's house.  The firefighters arrived to find the house in flames.  Some of the rooms were in disorder.  The victim's charred body lay on the kitchen floor, her head and face covered by a blanket.

The forensic pathologist determined she had died from blunt force trauma injury to the head.  Her injuries were consistent with numerous blows from a brick.  In the street near the victim's house, the police found a red plastic one-gallon gasoline can.  The arson investigator determined the fire had been started with gasoline.

The police recovered the victim's property, including two VCRs and a laptop computer, from a trash can located at a nearby house occupied by defendant and his mother.

---

[2]  Because defendant does not directly challenge the sufficiency of the evidence following the evidentiary hearing, the factual background is taken verbatim from defendant's prior appeal in case No. E074137 for context purposes only.  (See *People v. Barnes* (Aug. 27, 2020, E074137) [nonpub. opn.] (*Barnes II*).)  The factual background from *Barnes II* was taken from this court's nonpublished opinion in defendant's direct prior appeal, case No. E028010.  (*People v. Barnes* (Jan. 15, 2002, E028010) [nonpub. opn.] (*Barnes I*).)

The police arrested defendant after midnight on January 7. They advised him of his *Miranda*[3] rights, which he waived. In several recorded interviews, including a videotaped reenactment, defendant admitted that he had burglarized the victim's house in December. On that occasion, he had spent several hours in the house playing cat-and-mouse with the victim, who was hard of hearing. He had been drinking and felt panicked and scared. He urinated and defecated in one of the bedrooms. When he left, he took some property with him. He admitted returning on January 5 for several hours.

The jury viewed the videotaped reenactment. Defendant explained he initially entered the house on January 5 to return Mrs. Dresser's dog. Once inside, he latched the front door. He did not see anyone but he heard a woman in another room talking to a dog and giving it dry food. Defendant started walking down the hallway and heard a loud thump, "[l]ike somebody stomped their foot." He found the phone disconnected. Then he heard yelling and screaming. Next he located the woman, lying on the kitchen floor, bleeding and moaning. When he thought she had died, he covered her with a blanket. He was scared because he had been in the house a few weeks before. So he grabbed a VCR and other items to make it seem like a burglary had occurred. He threw the items out the window and then left by the window. He also got a can of gasoline and sprinkled it inside while ransacking the house. Then he ignited the gasoline and departed.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

4

B. *Procedural Background*

On May 19, 2000, defendant, who was 16 years old at the time the victim was killed and prosecuted as an adult, was convicted of first degree murder (§ 187, subd. (a)), first degree residential burglary (§ 459), and arson of an inhabited structure (§ 451, subd. (b)). As to the murder count, the jury found true the allegations that the murder was committed while defendant was engaged in the commission of first degree burglary (§ 190.2, subd. (a)(17)). Defendant was sentenced to an indeterminate term of life without the possibility of parole, plus a consecutive determinate term of eight years in state prison. (*Barnes II*, *supra*, E074137.)

Defendant subsequently appealed, arguing, among other issues, that his due process rights were violated by the interrogation conducted by the Rialto police. He particularly argued the police should not have kept him in custody for questioning for more than 15 hours without complying with the United States Code, Title 18, section 5033, and Welfare and Institutions Code section 627. (*Barnes I*, *supra*, E028010.) We rejected this argument and held that the alleged violation of defendant's state statutory right, as juvenile, to telephone parents and attorney immediately after being detained did not require exclusion of defendant's confession, and affirmed defendant's judgment. (*Barnes I*, *supra*, E028010, 2002 WL 53230.)

On February 22, 2019, defendant filed a petition for resentencing pursuant to former section 1170.95. (*Barnes II*, *supra*, E074137.) The trial court denied the petition after it determined Senate Bill No. 1437 was unconstitutional. (*Ibid*.)

5

On August 27, 2020, we found the statute was constitutional and remanded the matter to the trial court for a hearing on the merits of defendant's petition. (*Barnes II*, *supra*, E074137.)

Upon remand, after appointing counsel and eliciting further briefing and argument, the trial court found defendant failed to establish a prima facie case and denied defendant's petition without issuing an order to show cause. Defendant again appealed. (*People v. Barnes* (Dec. 19, 2022, E076618) [nonpub. opn.] (*Barnes III*).) In our original opinion, we concluded that the trial court impermissibly engaged in factfinding but found the error to be harmless because defendant's special circumstance finding rendered him ineligible for relief as a matter of law and therefore affirmed the summary denial of defendant's petition. (*Ibid.*) However, the California Supreme Court granted review and deferred the action pending its decision in *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*). (*Barnes III*, *supra*, E076618.) After deciding *Strong*, the Supreme Court transferred the matter back to this court with directions to vacate the original opinion and reconsider the matter in light of *Strong*. (*Barnes III*, *supra*, E076618.) We then reconsidered defendant's appeal in light of *Strong*, reversed the trial court's order and remand the matter for further proceedings pursuant to section 1172.6. (*Barnes III*, *supra*, E076618.)

On remand, the trial court held an evidentiary hearing on November 28 and December 6, 2023. At the evidentiary hearing, the trial court granted the People's

request to take judicial notice of the underlying record from defendant's original trial.[4]

Defense counsel did not object to "anything in those transcripts with the exception of the evidence of [defendant's] out-of-court statements[.]"

Claiming that defendant invoked his right to counsel multiple times while in police custody, defense counsel moved to suppress defendant's statements to law enforcement as involuntarily given and in violation of *Miranda*. Although defense counsel conceded the "voluntariness question" was litigated at the original trial, he argued that it was appropriate for the trial court to address admissibility anew because there had been substantial changes in the law, specifically the addition of Welfare and Institutions Code section 625.6 and Senate Bill No. 203, since the trial as to how to evaluate a minor's statement. After analyzing the new legislation and the bill, the trial court noted even if Welfare and Institutions Code section 625.6 was violated, that is one factor for the court to consider in determining the voluntariness and that trial courts still retain discretion to admit the statements on a case-by-case basis. The prosecutor corroborated the court's interpretation of the new changes in the law.

The prosecutor noted that the voluntariness issue was resolved on direct appeal in *Barnes I*, as well as at the Evidence Code section 402 hearing in which the detectives testified in regards to the *Miranda* issues and the court found defendant's statements to be admissible. The prosecutor further noted that there has not been a change in the law

_____

[4] We granted the People's request to take judicial notice of the record in defendant's prior direct appeal, case No. E028010, including the nonpublished opinion and People's exhibit No. 3 [three discs of the interrogation videos].

7

since age has always been a factor in determining voluntariness of a statement. In response to the trial court's question, the prosecutor indicated it would not be offering "other outside evidence" to prove defendant's guilt if the court found his statements to police involuntary. Rather, the prosecutor noted the record evidence established that the victim's home had been burglarized twice, including the day of the murder, she was beaten, murdered, property was stolen from her house, the house was set on fire, the stolen property was found in defendant's backyard, and defendant was not found until two days later.

In support of his section 1172.6 petition, defendant testified at the evidentiary hearing. Defendant testified as to the circumstances surrounding his interviews with law enforcement. Defendant explained that, around January of 1999, he was in tenth grade, his attendance at school was "horrible," and he would stay sometimes at his mother's house and sometimes with his best friend. In the early morning hours of January 7, 1999, he was sleeping on a couch at his friend's house when police came to the house and were calling his name. They handcuffed both his friend and him, and the officer told him that they had been looking for him, and "some detectives want to talk to you." Police read him his *Miranda* rights, and he testified, "first I told them I didn't want to talk to detectives, right, then he read me *Miranda* rights, then I told him that I wanted a lawyer." He stated that, in response to him telling them he wanted a lawyer, they told him "they go through the process when I get down to the Rialto Police Department," and "you'll do that when you get to where you're going." Defendant also stated he also asked police to

8

make a phone call to his mother so he could get a lawyer. Although defendant's friend's mother and his friend's aunt were going to follow him down to the police department, defendant claimed the police officers told them they could not do that because they needed to help police identify defendant's personal belongings from the house. After defendant was advised of his rights and told police he wanted a lawyer, he told his friend's mother and aunt to call his mother, and then police put him in an unmarked police car and drove him to the police station. During the 30-40 minute drive, police—who were sitting on both sides of him in the back seat of the car—did not ask him any questions, and he did not talk.

When they arrived at the police station, defendant was walked into a small, windowless "room with a desk and some chairs." While he was sitting in that room with an uniformed police officer, he still had handcuffs clasped behind his back. Defendant claimed he asked the officer to call his mother so he could get a lawyer. The officer responded that he could do that when the detective arrived. Defendant stated he had also asked for a phone call when he was getting into the police car. While waiting in the room, there was a second plain clothes officer with the uniformed officer, and he thought he was a detective so he also asked him for a phone call to his mother so he could call a lawyer. But the officer responded that he was not a detective and that "they're going to do that when the detective arrives." Later, a probation officer came into the room and stayed until a detective arrived. The probation officer and the other officers had a conversation in the hallway, and the probation officer asked them to take off his

9

handcuffs, which they did. The probation officer stated he needed to have defendant write on a form. The probation officer handed defendant a "juvenile *Miranda* waiver form" and he read and explained his rights slowly so that he could understand them. Defendant testified he knew enough about his rights that he knew he did not want to talk to police and wanted a lawyer. He also stated he initialed a box on the form that stated he did not want to talk to law enforcement and he wanted an attorney. He signed the form and the probation officer wrote the date and time on it, "January 7th, 1999, at 1:27 a.m." After he filled out the form, they waited for the detective to arrive, and his wrist hurt because the handcuffs had aggravated a basketball injury. Defendant "asked damn near everybody that came in and out of that room for a phone call" because he wanted to call his mother so she could get money for a lawyer. He testified that he wanted an attorney, and he had money saved up from working. He thought an attorney would cost about $200.

When the detective arrived, defendant testified he stood up and walked outside the interview room and stated to him, "they said you were going to give me a phone call." The detective responded that "he had to talk to me about why I had been arrested first." Defendant repeated himself by stating, "'but they said that you're going to give me a phone call when you got here. I want my phone call.'" The detective stated that he had to call defendant's mother but that he was not going to do that until after he talked to defendant about why he had been arrested. The detective eventually took defendant to another room in a "trailer-type building." Although they engaged in mostly "small talk"

10

while walking from one building to the other, he told the detective that the probation officer said he did not have to talk to him.

In the second interrogation room, there were two detectives present, and they were usually both in the room at the same time except they "kept on, like, tagging out." Defendant testified he only agreed to talk to detectives in the interview room because he "thought that would be the only way [he] would get [his] phone calls because [the detective] said not until after [he] talk[s] to [me] about why [I've] been arrested." The detective read him his *Miranda* rights from a "little card" he had with him. The detective asked if he understood each of his rights as he read them. When the detective began to speak with him about the crime, he asked him questions assuming he had committed the crime although defendant could not provide specific examples of what he meant because "it's like a blur." The second detective was "[v]ery confrontational" with defendant, and he would get upset whenever defendant denied something. During the interview, both detectives had their guns. Defendant did not tell them he did not want to talk because he believed getting a phone call and getting a lawyer were "conditional" upon him talking to police. His belief was based on what the detective had told him. When the detective asked him if he knew why he had been arrested, he stated, "because I did very bad things." He testified he only said that "to get the conversation started because [he] [did not] know why [he] had been arrested." The detective kept asking him if he went to the victim's house, and he kept saying "no." The detective never asked him how far he had gone in school, if he knew how to read or write, if he was tired, if he was hungry or

11

wanted something to drink, if he had any problems in school or had any educational disabilities, or if he took medication.

Defendant further testified he did not "think" he understood his *Miranda* rights when they were read to him because he waived his rights because he believed getting a lawyer was conditional on him agreeing to the interview. And he wanted a lawyer because he did not want to talk to the police. At some point during the questioning, defendant changed and stopped denying the accusations against him. He claimed this was because he was getting tired of the questions and the detective was "throwing out suggestions" about how the victim sustained her injuries and mentioned that "maybe it was an accident." However, what he told the detectives after this point was not the truth and was something he made up. He lied because he "got tired" of the questions and wanted the questions to stop. He also wanted to get his phone call and a lawyer. He took the information he learned from his neighbors on January 6, from the newspaper, and he "weaved the story" to make it seem "believable." Defendant stated that detectives "believed" the story, but it was not true. After he told them this "story," they took him to a holding cell around 7:20 a.m. and gave him a breakfast from McDonald's. During this time, they also performed a "sex kit" and took all of his clothes, blood samples, and they gave him a "paper jumpsuit" to wear.

Defendant also testified he had a second interview in the same room as the first interview that was shorter than the first interview. When they were walking back to the cell after the second interview, the detective told him he "had to go down to the crime

scene to make a video" so he could "clarify" some of things he had told the detectives. Defendant "thought" he had to do it so he gave them no "push back." Although he did not want to do the walk through, he did it because the detective "was an adult and he was a police and he's telling me stuff I have to do." He did not think he had a choice of whether to participate. After they did the crime scene walk through, the detective took him to juvenile hall. He was booked into juvenile hall, and he spoke with a probation officer. The probation officer advised him of his *Miranda* rights and explained everything to him, and he put defendant on the phone with his mother. Defendant claimed he did not "think" the statements he gave to the detective were "free and voluntary." Even though he did not want to talk to police, he spoke with them because "[t]hey were police and the way that it wasn't so much what [the detective] was saying but the way he said it I felt I had to." He never told the detective he was tired and in pain because he wanted to get the process over with so he could call his mother. His statements to the detective were not voluntary because the detective made his statements "conditional upon me getting a lawyer, if I wanted a lawyer." He testified he told the detective before the first interrogation that the probation officer had explained his rights and told defendant he did not have to talk to the detective because he had asked for a lawyer. Defendant claimed the detective told him probation and the police department are separate, and he did not know what form defendant was talking about but probation does not have anything to do with what the police are doing.

13

During cross-examination, defendant acknowledged that, at the time of the interrogation, he could read and write, that he knew "right from wrong, truth from lie," he could navigate the city bus system, he knew the streets of his town, he had no problems speaking or understanding the English language, and he routinely interacted with other adults in his life. During his interrogation, not everything he said was a lie. As the interrogation progressed, he continued to provide additional detail. He was in the victim's house before so he knew the layout of it. However, defendant noted the details he provided about pouring gasoline around the victim's body and setting the fire, but that information was based on the detectives and other police officers. He acknowledged that the information he provided from his own personal knowledge was "similar" to the actual details of the crime. He stated that he told his original trial lawyer about these invocations of his right to counsel and other related details. He did not raise these issues at his original trial because his lawyer wanted him to "take the stand," and he did not want to even though he knew the detective was "being deceptive" in his testimony. Defendant acknowledged that this court denied his writ of habeas corpus in June 2015 based on the illegal and involuntarily obtained statements.

After the presentation of evidence, the court continued the hearing so that it could review the videotapes and transcripts of the law enforcement interviews of defendant. When the parties reconvened, defense counsel argued defendant's statements should be excluded because they are not admissible under current law. Defense counsel noted defendant was not given his consultation with an attorney as required by Welfare and

14

Institutions Code section 625.6 prior to receiving his *Miranda* warnings, and he was supposed to be brought to the probation office within two hours of being taken into custody by police. Defense counsel argued he was also supposed to be given a phone call, and his parents should have been notified of his arrest. When defense counsel asserted that the failure to comply with the changes in the law rendered his statements inadmissible, the trial court responded that it is a "factor to consider" but it is not "categorically inadmissible for failing to comply." Defense counsel argued the statements should be inadmissible not merely for failure to comply but also because they were involuntary.

At the conclusion of the evidentiary hearing, the trial court found the evidence had proven beyond a reasonable doubt that "there is no real doubt that [defendant] acted alone; that there was no vicarious liability involved in this case." The court found "it's not a sort of natural and probable consequences case in the sense that a different perpetrator was involved in a crime. That the felony-murder theory certainly was presented to the jury, but this is not a case where the defendant aided and abetted a felony which then resulted in a victim's death. So there's no vicarious liability issues raised in this case. There's no evidence that anyone else is involved. Any suggestion that someone else might have been is unsupported by anything presented, even at the evidentiary hearing here or in the record at trial."

Turning to the voluntariness of defendant's statements, the court stated, "the question is, one big question, are [defendant's] statements admissible under current law?"

15

The court assumed, "for the sake of argument," that Welfare and Institutions Code 625.6 applied to defendant's case. Finding that a violation of the statute does not require exclusion of the subsequent statements, the court instead held that the "legislative mandate" required only that the failure to comply was "a factor to consider in determining the admissibility of the statements." The trial court noted that nothing in the "officer's conduct" was "abusive" and that they provided "a fairly straightforward reading of the rights." Of the effect of the rights, the court stated, "[defendant] is engaged with that. They're clear. They make sure that he–they ask him if he understands then. He says yes. He says he wants to talk." As to the interview itself, the trial court observed it did not "see anything involuntary" and, although it was an "interrogation," a "serious discussion," it did not "seem involuntary" or "coercive, even given [defendant's] age."[5] Addressing defendant's claim that he "invoked his rights several times," the court did not find defendant's testimony credible and instead found it inconsistent with the video of the interrogation. As to defendant's memory, the trial court noted defendant possessed "exquisite detail" about parts of the video that were not recorded but, for the recorded sections, "he didn't remember certain things because those can be verified because we can look at what actually was said." The court also found it "remarkable" that, as testified to by defendant, he had told the detective, "you know you can't talk to me. I want an attorney," but then the detective asked defendant, "Has anyone read you your rights before." While acknowledging defendant was in "some distress" and "some

_____

[5] On appeal, defendant does not challenge the trial court's determination that his statements to police were voluntary.

16

trouble," defendant told the detective he is there because "he's done some really bad things." And, even being "sensitive" to the "20 years of legal developments about juveniles' mental state" and "reading a lot of cases about that," the court concluded, "the statement seems voluntary to me, notwithstanding the fact that were the interview to happen today, yes, law enforcement would have to make sure that he spoke to an attorney." Even under those circumstances, the trial court found it would be "a factor to consider" rather than a rule of exclusion. Based on the "state of the evidence," the court stated, "there seems to me to be no doubt realistically that [defendant] did commit and could still be convicted of murder . . . under the current definition of murder." The trial court found beyond a reasonable doubt the evidence proved defendant was guilty of murder under the current law and thus denied defendant's petition for resentencing. Defendant timely appealed.

## III.

## DISCUSSION

Defendant argues the trial court erred in denying his section 1172.6 petition when it found he did not invoke his right to counsel in violation of the Sixth Amendment prior to his law enforcement interviews and thus his statements should have been suppressed. Because his statements to law enforcement were essential to proving his guilt, he contends that, if the statements are suppressed, the evidence is insufficient to support the trial court's finding beyond a reasonable doubt he was guilty of murder under current law. Hence, defendant believes the matter must be reversed and remanded for vacatur

17

and resentencing.  Defendant also asserts collateral estoppel does not bar his claim because prior litigation as to the admissibility of his statements to law enforcement involved only the question of voluntariness and not whether he had invoked his right to counsel.

A.  *Legal Principles*

Effective January 1, 2019, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) "'to amend the felony[-]murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'  (Stats. 2018, ch. 1015, § 1, subd. (f).)  'As amended by Senate Bill No. 1437, the text of section 189 provides no additional or heightened mental state requirement for the "actual killer" prosecuted under a felony-murder theory; it requires only that "[t]he person was the actual killer."  [Citation.]'"  (*People v. Bodely* (2023) 95 Cal.App.5th 1193, 1199-1200; accord *People v. Garcia* (2022) 82 Cal.App.5th 956, 967; see *People v. Lewis* (2021) 11 Cal.5th 952, 957, 971 (*Lewis*).)  Hence, with one narrow exception (§ 189, subd. (f)), the legislation effectively eliminated murder convictions premised on any theory of imputed malice—that is, any theory by which a person can be convicted of murder for a killing committed by someone else, such as felony murder or the natural and probable consequences doctrine—unless the People also prove that the nonkiller defendant personally acted with the intent to kill or was a major

18

participant who acted with reckless disregard to human life. (§§ 188, subd. (a)(3), 189, subd. (e).)

Senate Bill No. 1437 also added what is now section 1172.6, which established a procedure for vacating the murder convictions of defendants who could no longer be convicted of murder because of the amendments to sections 188 and 189. (Stats. 2018, ch. 1015, § 4; Stats. 2022, ch. 58, § 10; *Strong*, *supra*, 13 Cal.5th at p. 708; *Lewis*, *supra*, 11 Cal.5th at pp. 957, 959, 971; *People v. Gentile* (2020) 10 Cal.5th 830, 843; § 1172.6, subd. (a).) The initial version of former section 1170.95 permitted "a person with an existing conviction for felony murder or murder under the natural and probable consequences doctrine to petition the sentencing court to have the murder conviction vacated and to be resentenced on any remaining counts if he or she could not have been convicted of murder as a result of the other legislative changes implemented by Senate Bill No. 1437." (*People v. Flores* (2020) 44 Cal.App.5th 985, 992.)

Effective January 1, 2022, Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch.551) made substantive amendments to former section 1170.95 that were consistent with our Supreme Court's decision in *Lewis*, *supra*, 11 Cal.5th 952, and also "'[c]larifie[d] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories.'" (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18; *People v. Vizcarra* (2022) 84

19

Cal.App.5th 377, 388; see Stats. 2021, ch. 551, § 1, subd. (a); § 1172.6, subd. (a); *People v. Hurtado* (2023) 89 Cal.App.5th 887, 891.)

On June 30, 2022, the statute was renumbered as section 1172.6 without further substantive changes. (See *People v. Saibu* (2022) 81 Cal.App.5th 709, 715, fn. 3.) Under section 1172.6, "person[s] convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1172.6, subd. (a).)

After receiving a petition containing the required information, "the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.'" (*Strong*, *supra*, 13 Cal.5th at p. 708, citing § 1172.6, subd. (c).) If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subds. (c), (d)(1) & (3).) At this hearing, either party may present new evidence and the prosecution bears the burden of proving the petitioner could still be convicted beyond a reasonable doubt. (§ 1172.6, subd. (d)(3).)

In conducting an evidentiary hearing under section 1172.6, subdivision (d)(3), the trial court sits as an independent fact finder (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951) and must "'review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt

20

standard . . . .'" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480, quoting *People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  Under the usual substantial evidence standard, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "The standard is deferential, but the evidence in support of the judgment must be reasonable, credible, and of solid value; 'a mere possibility' or '[s]peculation is not substantial evidence' [citation]." (*People v. Brooks* (2017) 3 Cal.5th 1, 120, italics omitted.)  We defer to the trial court's resolution of conflicts and credibility determinations.  (*Clements*, at p. 298.) "'"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence."'" (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)  "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"When interpreting a statute, a court's role 'is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.]  'We begin as always with the statute's actual words, the "most reliable indicator" of legislative intent, "assigning them their usual and ordinary meanings, and construing them in context.  If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain

meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy."'" (*People v. Cody* (2023) 92 Cal.App.5th 87, 101 (*Cody*).) We presume the Legislature intended the entire statute to have effect, and we aim to avoid interpretations that render any part meaningless. (*People v. Arias* (2008) 45 Cal.4th 169, 180.)

Section 1172.6, subdivision (d)(3), "create[d] more than one standard for the admission of evidence at a resentencing hearing. First, it provides a general rule that admissibility is 'governed by the Evidence Code.' (§ 1172.6(d)(3).) It then exempts from the general rule 'evidence previously admitted at any prior hearing or trial that is admissible under current law.' (*Ibid*.)" (*People v. Palacios* (2024) 101 Cal.App.5th 942, 952 (*Palacios*).) "To the extent the phrase 'is admissible under current law' creates ambiguity, we think the most natural reading of those words is that the basis for admission of testimony at the hearing or trial in which it was previously admitted must remain a valid basis for admitting the testimony 'under current law.'" (*People v. Davenport* (2023) 95 Cal.App.5th 1150, 1158, italics omitted.) And the statutory language does not require that "properly admitted former witness testimony must once again be run through the rigorous filter of the rules of evidence. . . ." (*Palacios*, at p. 1159.)

A resentencing hearing under section 1172.6, "'''is not a trial *de novo* on all the original charges." [Citation.] Rather, it is a *postconviction* proceeding "due to the Legislature's inclusion of section [1172.6] in Senate Bill No. 1437 . . . , [as] an 'act of lenity' [citation], allowing for the retroactive application of the new law governing [liability for murder] [citation] for defendants already serving valid sentences for murder.''''' ([*People v. Williams* (2020) 57 Cal.App.5th 652, 661], quoting *People v. Wilson* [2020] 53 Cal.App.5th [42,] 53; see, e.g., *People v. Anthony* [2019] 32 Cal.App.5th [1102], 1156 [[§ 1172.6] petitioners do not have 6th Amend. trial rights].)" (*People v. Myles* (2021) 69 Cal.App.5th 688, 705-706.) Because a sentence modification under section 1172.6 is an act of lenity and not a criminal trial, the wrongful admission of evidence does not implicate defendant's Fifth Amendment privilege against self-incrimination. (*Myles*, at p. 706.)

B. *Analysis*

Even if we assume the issue raised in this appeal is not barred by collateral estoppel, defendant's failure to assert at his original trial that his statements to police were inadmissible based on his invocation of counsel forfeits the issue here. (*Palacios*, *supra*, 101 Cal.App.5th at p. 954 ["By exempting from general admissibility determinations evidence admitted at a prior trial, section 1172.6, subd. (d)(3) effectively extends the general forfeiture rule to resentencing hearings."].) Defendant filed a motion to suppress his statements to law enforcement at his original trial, but he never argued, or presented any evidence to support, a claim that he had invoked his right to counsel but

that his invocation was not honored.  Instead, at his original trial, as he concedes, defendant challenged the admission of his statements to police on the basis that they were involuntary.  During an Evidence Code section 402 hearing prior to his original trial, the detective who interviewed defendant testified as to the circumstances surrounding the interrogation.  The trial court watched the videotape of the interview and held "'there was a proper advisal of *Miranda* and that he understood the *Miranda* and waived those rights and was willing to talk to [the detective].'"  The thus court concluded the interview would be admissible at trial.  In addition, defendant raised similar issues challenging the voluntariness of his statements before this court several times.  Thus, defendant's failure to raise the issue of his invocation of counsel is forfeited here; "'[s]ection 1172.6 does not create a right to a second appeal, and [a petitioner] cannot use it to resurrect a claim that should have been raised in his [direct] appeal.'  [Citation.]" (*People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 936.)

Even if this issue is preserved, however, the trial court's factual finding that defendant's statements to law enforcement were admissible under current law is supported by substantial evidence.

Welfare and Institutions Code section 625.6 went into effect on January 1, 2018. (Stats. 2017, ch. 681, § 2.)  Subdivision (a) of Welfare and Institutions Code section 625.6, as originally enacted, provided that:  "Prior to a custodial interrogation, and before the waiver of any *Miranda* rights, a youth 15 years of age or younger shall consult with legal counsel in person, by telephone, or by video conference.  The

24

consultation may not be waived." Welfare and Institutions Code section 625.6, subdivision (b), provided that: "The court shall, in adjudicating the admissibility of statements of a youth 15 years of age or younger made during or after a custodial interrogation, consider the effect of failure to comply with subdivision (a)." Welfare and Institutions Code section 625.6 was amended, effective January 1, 2021, to apply to youths 17 years of age or younger. (Stats. 2020, ch. 335, § 2.) "[Welfare and Institutions Code] [s]ection 625.6 does not authorize a court to exercise its discretion to exclude statements if those statements are admissible under federal law." (*In re Anthony L.* (2019) 43 Cal.App.5th 438, 450; see *People v. Lessie* (2010) 47 Cal.4th 1152, 1170.) While the legislative findings underlying Welfare and Institutions Code section 625.6 discuss the cognitive development of juveniles (Stats. 2017, ch. 681, § 1; Stats. 2020, ch. 335, § 1), the statute does not provide an independent basis to suppress a statement. (*In re Anthony L.*, at p. 450.)

The law pertaining to the invocation of counsel is well-established. "'If a suspect indicates "in any manner and at any stage of the process," prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated.' [Citations.] Once the right to counsel has been invoked, further questioning is forbidden until counsel has been provided, 'unless the suspect personally "initiates further communication, exchanges, or conversations" with the authorities.' [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 384.) Upon review of a trial court's denial of a suppression motion on the basis that there was an invocation of counsel, an appellate

25

court accepts "the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.) The appellate court, however, "''independently decide[s] whether the challenged statements were obtained in violation of *Miranda*.'" [Citations.]" (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.)

Here, the trial court thoroughly reviewed the pertinent record, including the lengthy interrogation videos and transcripts, engaged in extensive discussions with counsel, and researched the applicable law with a particular emphasis on impacts to minors. In finding defendant's statements admissible, the trial court stated, "And specifically [defendant] said he invoked his rights several times. I don't find that testimony credible. I think it is inconsistent with the part of the video that we can see." The trial court further noted defendant's ability to recall "with exquisite detail" parts of the interview that were not recorded but could not remember information that was part of a recording and could be verified. The court further found it "remarkable" that the detective, "having just been told by [appellant] on the way to the interview" that "'you know you can't talk to me. I want an attorney[,]'" immediately asks defendant if anyone has read him his rights before and defendant says, "no." The only evidence of defendant's invocation was from his own testimony at the evidentiary hearing. However, our independent review of the record shows that testimony was unsupported by other evidence in the record. The trial court's factual determination that defendant did not invoke counsel prior to making the statements that were admitted at his original trial was

supported by substantial evidence. Aside from defendant's own self-serving testimony, there was no evidence in the record to support defendant's claim that he had invoked his right to counsel prior to his police interviews. During his testimony, defendant acknowledged that he filed a motion for postconviction discovery in 2013 to ascertain the identities of individuals who he claimed had provided *Miranda* warnings to him. Although an investigation was conducted in response to his motion, the identity of the officer who had given defendant the *Miranda* warnings was never ascertained. And his further pursuit of this information through writs of habeas corpus was denied by this court in 2015. Indeed, defendant litigated a motion to suppress his statements at his original trial, but he did not testify in support of his motion and raised only a claim that the statement was involuntary. Beyond that, however, in concluding defendant's testimony was not credible, the trial court noted the inconsistencies between the video evidence of his interrogation and his testimony at the evidentiary hearing. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139 ["By taking the stand, defendant put his own credibility in issue."].) Thus, the trial court's factual determination was supported by substantial evidence.

Defendant argues the enactment of, and policy behind, Welfare and Institutions Code 625.6 "should have been directly considered by the trial court in determining whether [defendant] invoked his right to counsel here." The trial court, however, did just that at the evidentiary hearing.

27

Although the trial court considered this statutory section in its analysis under section 1172.6—as to whether the statements were admissible under current law—the question of whether defendant invoked his right to counsel was a separate, factual determination that required the trial court to conduct a credibility assessment of the pertinent evidence, including defendant's testimony. As defendant argued at the evidentiary hearing, the impetus for Welfare and Institutions Code 625.6 was to ensure that minors were aware of, and could meaningfully exercise, their rights with the assistance of counsel. However, defendant does not argue on appeal he was unaware of his rights. To the contrary, his claim is that he knew his rights and affirmatively exercised them, but his invocation was not honored. Thus, the existence and application of Welfare and Institutions Code 625.6 is not relevant to the trial court's determination that defendant's invocation of counsel did not occur. As found by the trial court, and as acknowledged by defendant, the detective read defendant his *Miranda* rights prior to the recorded interview, and defendant waived his rights and provided a statement to law enforcement. The trial court determined defendant did not invoke his right to counsel prior to receiving, and waiving, his *Miranda* rights. Our own review of the record supports the trial court's findings.

As a result, defendant's claim that his statements are not admissible under current law because he invoked his right to counsel is without merit. (§ 1172.6, subd. (d)(3).) And defendant's statements to law enforcement support the court's finding defendant was

28

the actual killer and thus ineligible for resentencing. The court thus properly denied defendant's section 1172.6 petition.

## IV.

## DISPOSITION

The trial court's postjudgment order denying defendant's section 1172.6 petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
                                                                            J.

We concur:


MILLER
          Acting P. J.


FIELDS
                    J.